FORCE *et al. v.* PROVIDENCE WASHINGTON INS. CO.

*(District Court, S. D. New York.* June 4, 1888.)

**1.** MARINE INSURANCE — INTEREST OF BOTTOMRY LENDER — SALVAGE — COLLECTION OF FREIGHT AT INTERMEDIATE PORT — DISCHARGE OF INSURANCE — FOREIGN LAW.

Libelants made advances on an obligation by which the master of a German bark bound. for I. and M. promised to pay a certain sum "ten days after arrival at *final* port of destination," for which payment he pledged vessel and freight, and directed his consignees at the port of *final* destination to pay the obligation from the first amount of freight received. Respondents insured libelants on "advances against captain's draft," the policy covering "all perils of the seas which reduce the things hypothecated to a less value than the sums insured, or which prevent the collection of said draft in whole or in part." At I., the vessel discharged part of her cargo, and collected $1,900 freight, and on the way from I. to M. she foundered, and was a total loss. A letter from the owner stated that the I. freight "was only enough to pay expenses for discharging at a port of distress, and the owners got no benefit." *Held* that, though the bottomry lender was entitled to salvage, if there was any, it was to be inferred that the freight collected was lawfully used by the master for the necessities of the voyage; also, that libelants had no resulting right to compensation therefor against the owners under the provision of the German Code, art. 452, which provides that contracts made by the master under his ordinary authority constitute no personal obligation upon the owner; that the contract assured payment out of the freights to be collected at the *final* port; and on both grounds *held*, that the collection of the Ilo Ilo freight did not discharge the insurance *pro tanto.*

**2.** SAME — ABANDONMENT — SUBROGATION — NOTICE — WAIVER.

Where full payment of insurance on advances upon a bottomry obligation is refused on the ground that the insurance contract was *pro tanto* discharged by the collection of freight, notice of abandonment to the insurers of any claim of the insured against master or owner by reason of such collection of freight is waived.

In Admiralty. Insurance on bottomry draft.

*Sidney Chubb,* for libelants.

*George A. Black* and *J. Adriance Bush,* for respondents.

BROWN, J. The libelants are indorsees of a bottomry obligation of which the following is a copy:

"£912  6  11  Stg.                          NEW YORK, July 12, 1883.

"Ten days after arrival at final port of destination of the German bark called 'Betty Wendt,' of which I am the master, now lying at New York, loaded with Refd. petrm. in cases, and 300 cases turpentine, and ready to sail for Ilo Ilo and Manilla, I promise to pay to the order of C. Tobias & Co., nine hundred and twelve pounds, six shillings, and eleven pence, British Sterling, in approved bankers' demand bills on London, value received, for necessary disbursements of my vessel at this port, for the payment of which I hereby pledge my vessel and freight; and my consignees at the port of final destination are hereby directed to pay the amount of this obligation from the first amount of freight received, for account of my said vessel. Any other draft or obligation by me drawn at this port on said freight to be secondary to this.

[Signed]     "M. SPIEGELBERG, Master of Ger. Bk. Betty Wendt."

It is conceded that the above draft is a valid instrument of bottomry. *Force v. The Pride of the Ocean,* 3 Fed. Rep. 162. The libelants having advanced money upon this draft, on the 12th of July insured their in-

terest with the respondents, and received from the latter a certificate that they were insured under an open policy "in the sum of $4,560, on advances against the above obligation, valued at sum insured at and from New York to Ilo Ilo and Manilla." On the margin of the certificate was stamped the following provision: "Advances against captain's draft, for vessel's disbursements, hypothecating vessel and freight, the ownership of draft to be proof of interest; the policy is to cover all perils of the seas of every kind which reduce the things hypothecated to a less value than the sums insured, or which prevent the collection of said draft, in whole or in part, whether said perils are those covered by insurance policies on vessels, freights, or cargoes, or not," subject to abandonment and subrogation, as usual. The bark upon her voyage stopped at the intermediate port of Ilo Ilo, discharged there a part of her cargo, and collected $1,900 freight. On the way from Ilo Ilo to Manilla she foundered, and was an actual total loss. The libelants under the insurance certificate demanded of the respondents payment in full. The latter claimed, and their answer contends, that the $1,900 received by the master for freight at Ilo Ilo became at that moment applicable to the draft, being held by the master for the libelant's benefit; and that his receipt of that sum operated at once as a satisfaction and discharge of the insurance contract *pro tanto*. This claim being contested by the libelants, the balance of the amount covered by the insurance was afterwards paid by the respondents, and accepted by the libelants, without prejudice. Upon subsequent correspondence, and a demand on the owners of the bark for the sum of $1,900, payment was refused, on the ground that none of the money had ever come to their hands, or to their use or benefit; the same being "only enough to pay expenses for discharging at port of distress." The parties have left the case without further evidence on this point; but from the language quoted the fair inference is that the money was used by the master for the needs of the ship in a port of distress, to enable her to complete her voyage from Ilo Ilo to Manilla. The above libel was thereafter filed to recover the residue of $1,900.

The contract of insurance in this case expressly provided that the policy was "to cover all perils of the seas of every kind which should reduce the things hypothecated to a less value than the sum insured, or prevent the collection of said draft in whole or in part." The utter loss of the vessel and cargo by foundering, shortly before reaching Manilla, was a loss by a peril of the sea; and it was a loss much in excess of the sum insured. Had not that loss occurred, the whole draft would have been collected at Manilla, without reference to the Ilo Ilo freight, or the use made of it. The foundering, therefore, in literal strictness prevented the collection of the draft; and within the letter of the policy, therefore, the respondents are *prima facie* liable for the whole amount insured. *Potter* v. *Insurance Co.*, 4 Mason, 298, 301. The case of *Broomfield* v. *Insurance Co.*, L. R. 5 Exch. 192, is not applicable; for that decision was on the ground that there had not been an actual total loss of the ship. The terms of the policy in that case are not stated; they could not have

been like the present; or, if so, I could not follow the decision, as it would seem plainly to nullify the contract.

It is competent for the respondents, however, to show, if they can, by way of defense, that before the loss occurred the insurance contract was in part already discharged; or, if not discharged, that some claim accrued to the libelant, to which the respondents, on payment in full, would have been entitled by abandonment or subrogation; and that they have lost the benefit thereof through the libelants' acts or laches. The burden of the proof is, however, upon the respondents to show all such facts as would be necessary to establish this defense. In their behalf it is claimed that this defense *pro tanto* is established: (1) By proof that the master collected $1,900 freight at Ilo Ilo; and (2) by the neglect of the libelants, until about a year after the stranding, to give to the insurers any express notice of the abandonment of their claim against the master or owners by reason of the collection and use of that money. For the libelants it is urged that as no money was payable by the terms of the draft until 10 days after arrival at the *final* port of destination, the debt became extinguished by the utter loss of the vessel before arrival; that the lien was merely incidental to the personal obligation, and subject to the same ultimate condition; so that no lien or claim in respect to the freights collected at Ilo Ilo, or upon the wreck, if any had been recovered, survived the disaster.

I have not been referred to any English or American authority directly determining either of these contentions. Upon the last point it may be observed that the bottomry draft, as respects payment and the enforcement of the lien, contemplated performance at Manilla, a Spanish port. If, as regards the things to be performed there, it be held operative according to the Spanish law, as the *lex loci solutionis*, (*Pritchard v. Norton*, 106 U. S. 124, 136–141, 1 Sup. Ct. Rep. 102, and cases there cited,) the lien on the wreck would remain, though the personal obligation of the borrower was extinguished. By the Code of Spain, (section 734) and in the Codes of most other continental nations, payment, in case of shipwreck, is reduced to the value of the things saved, less the salvage expenses. 1 Phil. Ins. § 1170; French Code of Com. § 327; Italian Code, § 599; Netherlands Code, § 588. Or, if the question were determined by the law of the ship, which is German, the right of the bottomry lender would be the same. German Code, §§ 691, 692. Aside from foreign law, I think the same rule, as respects any salvage from the wreck, or any claim in the nature of salvage that might survive, should be upheld, as most in accord with the reasonable intention of the bottomry contract. Bottomry, though a contract *sui generis*, (*The Ann C. Pratt*, 1 Curt. 340, 350,) is often treated as a peculiar species of insurance; the amount insured being paid in advance upon an express pledge, *in præsenti*, of the ship or freight, or both, for repayment of the advances with a maritime premium, unless the things pledged are lost before arrival at the specified port by some of the perils which the lender assumes. 1 Phil. Ins. § 1168; 2 Am. Ins. (6th Ed.) 40; 3 Kent, Comm. *357. The risks that the lender is to bear were formerly enu-

merated fully in the contract, as in an insurance policy proper. For convenience, brief forms, like the present, have recently come into use, in which all save the prime condition of arrival at the port of destination is left to implication. 1 Phil. Ins. § 427. There are many conditions and qualifications universally deemed incident to bottomry contracts in addition to that expressed in the brief form of this draft. 3 Kent Comm. *355. And as the parties here plainly intended bottomry, the fair implication is that they intended it with all the ordinary incidents, rights, and qualifications that usually attach to bottomry contracts, as commonly expressed in the full and formal instruments most in use; and these, says Phillips, include both average and salvage. 1 Phil. Ins. § 1175. The oldest and most used form expressly reserves to the lender "any average that may be secured upon any salvage recoverable from the wreck." Where that form is used, no doubt now exists. *Insurance Co. v. Gossler*, 96 U. S. 645, and cases there cited. Other full forms contain no clause upon this subject; while, in other forms still, the whole contract is declared void in case of the loss of the vessel. See *Appleton v. Crowninshield*, 3 Mass. 443, 8 Mass. 340, where there was no express pledge of the vessel. In the case of *The Great Pacific*, L. R. 2 P. C. 516, L. R. 2 Adm. & Ecc. 381, 385, Sir ROBERT PHILLIMORE suggested the question, but without deciding it, whether in the absence of the clause concerning salvage in a full and formal instrument of bottomry, the lender would by the general maritime law have a right to the benefit of the proceeds of the wreck. In the case of *The Empusa*, 5 Prob. Div. 6, 12, upon the utter loss of the vessel from collision, the lender upon a bottomry draft just like the present was held entitled to the benefit of the damages recovered by the owner by reason of the loss. The same result was reached in the case of *Appleton v. Crowninshield*, 8 Mass. 340, 359, 360, in an action for money had and received in respect to an award made for the illegal capture of the bottomried vessel, though the decision was there rested in part on the intention of the award.

If the bottomry lender may follow into the hands of the owner the moneys recovered for the sinking of a vessel by collision, I see no reason why he could not equally follow the proceeds of the wreck, or the wreck itself. This draft, as I have said, created an express lien *in præsenti;* and although it could not be enforced by any steps to collect it, so long as the voyage was pending, there is no express language that either discharges the lien, or is incompatible with its existence upon what may remain, in case the voyage is broken up by disaster before arrival at the final port. In the absence of such language, in a brief instrument of this kind, it is not reasonable to suppose that the parties intended any less rights to be conferred on the lender than those most commonly given by the ordinary full forms of bottomry; or that the lender should recover nothing upon his lien because he could not recover the whole, and when, by reason of the wreck of the vessel, his loss would be greatest. *Stephens v. Broomfield*, L. R. 2 P. C. 516, 524. Viewing bottomry, also, as a species of insurance, the lender could not be justly excluded from salvage as against the insurers of the ship upon an abandonment

by the ship-owner; for such insurers are entitled to bring a subsequent bottomry loan into account in diminution of the amount payable to the ship-owner, as a reduction of his insurable interest.     *Read* v. *Insurance Co.*, 3 Sandf. 54, 63; *Watson* v. *Insurance Co.*, 3 Wash. C. C. 1; *Allen* v. *Insurance Co.*, 1 Gray, 154; 2 Pars. Mar. Law, 418.     By various continental Codes, insurance of sums *borrowed* on bottomry is void; though everywhere insurance of moneys *lent* is valid.     German Code, § 873; Italian Code, §§ 638, 599, 607, French Code de Com. §§ 379, 380, 331, 347; Netherlands Code, §§ 675, 599, 600.     On a constructive total loss, therefore, the benefit of the salvage ought to inure to the bottomry lender, as much, at least, as to the insurers of the ship; otherwise, the latter would get the whole benefit of the bottomry as a partial insurance, and of all of the wreck besides.     The French Code, (section 331,) following, in such cases, the views of Valin, requires a *pro rata* division.     By our law the bottomry lender, in such a case, takes the whole salvage; because the insurer stands only in the shoes of the owner; and the latter, contrary to the views of Valin, is not deemed entitled to come into concourse with the lender as respects any excess in the original value of the pledge. This says, Émérigon, is based, not on logical grounds, but on the arbitrary favor accorded to the bottomry lender.     3 Kent, Comm. *359; *Insurance Co.* v. *Gossler*, 96 U. S. 652, 656; Émérig. Traité des Assur. c. 17, § 12; 3 Valroger, Droit Mar. §§ 1149–1156.     Upon a brief contract like this bottomry draft, therefore, where much is necessarily left to implication, (1 Phil. Ins. § 427,) I think the express lien survives, so long as any part of the *res* remains, the same as where the average clause is inserted.     Such is the right of the ordinary bottomry lender, according to the continental authorities, (*Appleton* v. *Crowninshield*, 3 Mass. 463, 467, 8 Mass. 363;) such are the express provisions of various continental Codes, (1 Phil. Ins. § 1170; French Code of Com. § 327; Italian Code, § 599; Netherlands Code, § 588;) and such is the Code of Germany, §§ 691, 692, to which country this vessel belonged.     But no lien can survive the loss of the *res* itself, and of all the proceeds of funds that represent it.     If the Ilo Ilo freight money was necessarily expended for the completion of the voyage, in consequence of previous sea perils, and was subsequently lost with the ship, nothing could remain save a possible right of action against the master or owners for a subtraction of the fund, provided the use made of the freight moneys was unlawful; or for indemnity, in case any legal right of indemnity accrued from the master's use of the money.     This will be referred to below, in connection with the question of abandonment.

2. This insurance contract was not a divisible contract, as respects the different ports of Ilo Ilo and Manilla; nor was it discharged *pro tanto* by the master's collection of the $1,900 freight at the first port.     Had the case been one of simple insurance by a ship-owner of his whole *freight* at a valued sum, such would have been the legal effect of the contract, (2 Phil. Ins. § 1499,) for the insurance follows the risk and the subject-matter insured; and when the freight at an intermediate port is fully earned and collected, without any impairment through prior sea perils,

"it becomes immediately available to the owner as his property; and, being no longer at risk, the intent of the insurance contract is *pro tanto* fulfilled. But the situation of the insured lender on bottomry, and the intent of this contract, are evidently wholly different. This insurance was not an insurance of "the ship" or "freight." Under that language the bottomry lender would not have been covered; his policy would have been of no value. 1 Phil. Ins. § 427. By all the Codes and text writers, sums *loaned* on bottomry are a separate and distinct subject of insurance. This certificate declares the insurance to be "on advances against the bottomry draft valued at $4,560," and to cover " all sea perils that might prevent its collection, in whole or in part." The insurance began when the risk began, and ended only when the risk ended. The lender's risk was the risk of being unable to collect his advances from the ship and freight; and his risk continued in its entirety until the vessel reached Manilla, or was lost. Even had this contract directly insured " the ship and freight" to the extent of $4,560, the insurers could only have been credited, as respects the $1,900 collected, with such proportion of it as the $4,560 bore to the whole value of the ship and freight, *i. e.*, with probably not over one-fifth of it; the owner being deemed his own insurer as to the residue, and as such entitled to his *pro rata* of the collections. But the fact that the Ilo Ilo freight had been earned and collected did not diminish in the least the bottomry lender's risk on his advances, because that freight was not then legally available to him, and might never become available; and in that event it could not possibly dischárge any part of the obligation of the draft, or of the risk attendant upon it; and hence it did not discharge any part of the insurance contract, which guarantied its "collection" at Manilla as against sea perils. The insurance contract, I repeat, was neither in substance nor in effect an insurance of the Ilo Ilo *freight*, but an insurance of the $4,560 *loan*, and of its collection at Manilla, so far as collection might be defeated by sea perils. No collection could avail in discharge of the insurers unless or until it was legally available to the lender; and by the draft nothing was available until arrival at Manilla, or the breaking up of the voyage. The conditions of the draft applied to it as an entirety; and the insurance contract, which was commensurate with the risk, continued in its entirety.

· The libelants, moreover, by their loan and draft, did not become owners of any part of the ship or freight. *Insurance Co.* v. *Gossler*, 96 U. S. 645, 654. They acquired a lien or privilege upon them, and nothing more. They could not abandon either ship or freight, in case of a constructive total loss; that right belonged to the ship-owner only. The libelants could abandon only their interest in the draft and in the lien created by it. By the very terms of the draft it could not be enforced except upon arrival at Manilla; or, by implication of law, upon the previous loss of the vessel, so far as respects any salvage from the wreck. This is shown conclusively, both by the condition of the whole obligation, and by the further express provision of the draft itself, which directs the " payment of the amount of this obligation [*i. e.*, the whole amount] by the consignees at the final port of destination from the first amount of freight received."

It is a part of the definition of bottomry (article 680 of the German Code) that "the creditor can exercise his rights only upon the hypothecated objects after the arrival of the ship at the place where the voyage ends." Such is clearly the ordinary incident of bottomry.    When the $1,900 was collected, the libelant, therefore, even if present at Ilo Ilo, could not have claimed it.    He could take no steps to "collect" his draft till the end of the voyage.    His own risk and that of his insurers, therefore, continued entire until that time.    The rights of the assured are to be judged according to the state of things as they actually existed at that time. The insurance contract speaks as from that time.    It admits of no severance as respects the two ports; because the draft admits of no severance, and no part of either contract was fulfilled or discharged.

In view of the above-quoted provision of the draft itself, I think its true construction and intent are practically not to subject the Ilo Ilo part of the freight to the bottomry lien at all.    The evidence shows that the Manilla freight would have been three times that of the Ilo Ilo freight, and considerably in excess of the whole draft, to say nothing of the value of the ship, which was also pledged, and the express direction to the consignees at Manilla to pay the whole sum out of the Manilla freights, clearly shows that that was the special fund from which the parties intended the loan should be paid.    It was known that freights would be collected at the intermediate port of Ilo Ilo.    It is not credible, considering the terms of this draft, that the parties intended or expected that the Ilo Ilo freights should be tied up until the vessel reached Manilla. Had those funds been intended to be applied to the draft, there is no reason why that intent should not have been expressed, and those freights directed, like the Manilla freights, to be applied on the loan, so far as they would go.    On the contrary, the Ilo Ilo freights are virtually excluded, both by postponing all payment till the final port of Manilla, (the word "final" being written and interlined in the printed form,) and by devoting the Manilla freights to the payment of the whole amount. The specific provision controls the former general one.    This construction of the draft is apparently sustained by the remarks of Émérigon as respects the owner's rights at intermediate ports, on a pledge of cargo, even without the aid of any such special provision as this in the bottomry contract.    "The borrower on bottomry of merchandise," says he, "is not bound to put at risk more than the amount of the loan.    If he gives more, it is voluntary, and the excess is not irrevocable.    He may, in the course of the voyage, discharge such excess of merchandise, without the lender's having any right to complain.    *    *    *    If the borrower shows that at the time of the disaster he had effects of his own equal to the sum borrowed, he is freed from all obligation; and the contract, as respects the lender's rights, will be reduced to the value of the effects saved from the wreck itself."    Conts. à la grosse, c. 12, § 2, p. 569.    See Ordinance 1681, tit. 5, § 14; Code de Com. § 329; Italian Code, § 602. Boulay-Paty, in his *Conferance*, expresses no dissent to this doctrine, and it is sustained by the latest French authors, (5 Desjardines, Droit Com. Mar. § 1192, p. 321; 2 Laurin, Cresp. Droit Mar. 371.)    Val-

*roger* (2 Droit Mar. p. 139, §§ 1120, 1133) would limit the owner's right to deal independently with the excess to circumstances contemplated by the contract; such as "upon a loan for a voyage out and back, or one giving a right to deal at intermediate ports;" and such is precisely the present case.

3. In either point of view, therefore, I must hold the respondents *prima facie* liable for the whole amount of the insured draft, because there was an actual total loss of the ship and of the Manilla freight by sea perils before reaching Manilla, in excess of the amount insured. If, however, it appeared that there was any other fund available to pay any part of the draft, either from the existence of the Ilo Ilo freight moneys *in specie*, or of any subsisting legal claim by reason of the use made of that money by the master or owners, (assuming that that part of the freight was subject to the pledge,) the insurers, on payment of the draft in full, would be entitled to the benefit of such fund or claim for their reimbursement. The loss, taking the Ilo Ilo freight into account, would not, in that case, be an actual total loss, but only a *constructive total* loss; and the assured, on demanding payment in full, would be required to abandon that claim to the insurers, if any express abandonment, or notice of abandonment, in such a case were necessary. From the correspondence between the parties, it is evident that the libelants did make a demand of payment in full, which the insurance company rejected on the ground that the $1,900 Ilo Ilo freight was applicable to the draft, and was of itself a *pro tanto* discharge of the insurance; a defense which, as I have above held, is not tenable. The agents of the company seem to have been the first to receive intelligence that freight had been collected at Ilo Ilo; and soon after (in February, 1884,) they suggested that the libelants, "for their own protection, should have their friends at Ilo Ilo attend to the collection of so much of the draft as was covered by the freight on that portion of the cargo." In July following, payment of the amount, less the $1,900, was made to the libelants, without prejudice. Afterwards, in August, the libelants, through their adjusters, applied to the indorsers of the draft for payment of the balance, which was refused. Negotiations seem to have been continued with the respondents, who, in a letter of September 27, 1884, promised to aid the libelants, through their counsel, "in arriving at a proper settlement of the $1,900 collected and sent to the owners." Much delay seems to have ensued in ascertaining where the owners were, or in communicating with them. In May, 1886, application was made by letter to one of the owners at Barth, Germany. In June, 1886, he replied:

"The general average of the vessel in question has been settled some two years ago. According to our law, the agents [owners] are not personally responsible for your demands, and I am thus not able to collect anything from the former owners. * * * From the money collected by Captain Stickleberg at Ilo Ilo, I received nothing. The same was only enough to pay expenses for discharging at a port of distress, and the owners got no benefit."

While these various efforts were being made, the libelants, on the 24th of January, 1885, gave to the defendants a formal notice of abandon-

ment of their interest in the bottomry draft, which the respondents a few days afterwards declined to accept, without any statement of their reasons. I greatly doubt, in a case of this kind, where no specific property remains to be dealt with, but at most only a possible right of action for indemnity, whether there is need of any abandonment by the insured beyond that which is implied in the claim of a total loss. See *Insurance Co.* v. *Southgate*, 5 Pet. 604. 2 Phillips (Ins. §§ 1682, 1683, 1723) concludes that "the claiming of a total loss is a sufficient expression of an intention to abandon." Lowndes (Ins. §§ 144, 248) says that "the mere act of claiming a total loss is equivalent to abandonment; and, if made in time, no other notice is requisite." As respects a mere claim for indemnity against a third person, the language of the supreme court in the case of *Insurance Co.* v. *Transportation Co.*, 117 U. S. 312, 6 Sup. Ct. Rep. 750, 1176, seems clear and decisive on this point, although there was notice of abandonment in that case. The court says, (page 320:)

"When goods insured are totally lost, actually or constructively, by perils insured against, the insurer, upon payment of the loss, doubtless becomes subrogated to all the assured's right of action against third persons who have caused or are responsible for the loss. No express stipulation in the policy of insurance, or abandonment by the insured, is necessary to perfect the title of the insurer."

There can be no doubt that on payment of the draft in full, the insurers in this case would have been entitled to any right of action, if any there was, that the libelants had on account of the master's use of the Ilo Ilo freight to complete the voyage. When the libelants made their demand of full payment, it is not conceivable that they intended to retain, or that the defendants imagined that they intended to retain, for their own benefit, any right of recourse against the master or owners; nor, if such had been their intention, would it have been of any avail against the defendants' legal rights by way of subrogation. Again, the ground upon which payment in full was refused, viz., that the insurance contract was *pro tanto* discharged upon the collection by the master of the $1,900 freight at Ilo Ilo, was equivalent to a waiver of notice, if that were otherwise necessary; for the refusal on that ground rendered notice of abandonment an idle ceremony, and was equivalent to a rejection of any abandonment; because that ground was incompatible with the acceptance of any abandonment. See 2 Phil. Ins. § 1684 *et seq.* Both parties were acting on the supposition that this freight money, or part of it, had been "sent to the owners," which, upon the correspondence offered in evidence by the defendants, it now appears was not the fact. The assured, if abandonment was necessary, were also entitled to a reasonable time to ascertain the facts; and the express notice of abandonment in this case, though nearly a year after the loss of the vessel, was a year and a half before the facts were fully ascertained. In endeavoring to learn these facts they had the assistance of the respondents; and there is no indication that the latter sustained the slightest prejudice through the delay before formal notice of abandonment was in fact given.

I am further of opinion that upon the facts, as they appear upon the

evidence offered by the defendants, there was nothing to abandon; and no legal claim against either the master or the owners in respect to the Ilo Ilo freight, since it appears to have been all properly used in a port of distress for the completion of the voyage. Such a use of the freight money, as I have already said, must be inferred from the evidence offered on that subject. If this evidence is meager, and in some respects unsatisfactory, the burden of proof rests upon the defendant. Inasmuch as the insurance was not an insurance of the specific Ilo Ilo freight, but of the draft, insuring it against any sea perils that might prevent its collection at Manilla, the existence of any outstanding claim on account of the master's previous.use of freight receipts that might have become available, analogous to salvage, would at most be in the nature of a partial offset, the existence of which the insurers are bound to establish. The mere fact of previous collection of some freight at an intermediate port is not enough; since that fund is primarily liable to be used for the necessities of the voyage. To constitute a partial defense to the insurers it must appear that at the close of the voyage, when the draft could first be enforced, something still remained that was legally available to the assured. The use of the freight money collected by the master in a port of distress for the necessities of the voyage, was a use of it in lieu of further bottomry on the ship and unearned freight. It holds the same relation to the prior lenders on bottomry and to their insurers that subsequent bottomry would have held to them. The Cynthia, 16 Jur. 749. The maritime law imposes upon the master the duty of using such moneys to complete the voyage, rather than to execute a new bottomry. Thomas v. Osborn, 19 How. 22, 31. So long as that money lasted, he had in fact no authority to execute further bottomry, with its incident of a maritime premium. The use of that money was, like new bottomry, in the eye of the law, for the benefit of all interested in the voyage. Had new valid bottomry been executed to repair the damages, or defray the expenses caused by sea perils, it must have been paid out of any proceeds of the wreck on arrival at Manilla, in preference to the prior bottomry. The libelants' lien on the freight money collected at Ilo Ilo no more superseded the master's authority and duty to use those moneys to complete the voyage, than it superseded his authority to hypothecate the ship, and the Manilla freights, if necessary, on which the same lien existed.. The legal liability of the freights collected to be used, instead of subsequent bottomry, for the purpose of completing the voyage, was in fact one of the legal incidents of the adventure, and one of the legal risks that the lender on bottomry and his insurers incurred when they entered upon their contracts. Such use of it was not a wrongful subtraction of the fund.

It is urged that the respondents did not insure against a risk of this character, and that that risk was not a peril of the sea. In the case of Greer v. Poole, 5 Q. B. Div. 272, it was held that a loss of part of the cargo through bottomry made to complete the voyage was not a loss by a sea peril for which the insurer of the cargo was liable; but it was conceded that the loss in that case was not general average; while in this

case the correspondence shows a loss usually regarded as general average, viz., unshipping cargo at a port of distress. 2 Phil. Ins. § 1302; German Code, § 708, subd. 4. It is immaterial, however, whether the expenses to which this money was applied were a general average loss or not; or whether, upon an insurance of bottomry like this, freights earned at an intermediate port continue insured to the close of the voyage; since this insurance, as I have said, was not of the ship and freight, but of the advances as against all sea perils that might "prevent their collection" at Manilla. The only question material to the defense is, therefore, whether upon the stranding of the vessel there remained any claim legally available towards the payment of the bottomry draft. The question would have been the same if after the landing of the Ilo Ilo cargo the goods were destroyed by fire, and, the consignees being insolvent, no freight was ever collected. Though the insurers on bottomry may not have insured against such a fire or insolvency, the mere earning of some freight could not have constituted any defense to their full liability for a subsequent loss by sea perils in excess of the draft. It would be the same if the $1,900 freight moneys had been collected in coin, taken on board, and gone down with the ship. Whether that coin continued insured or not, this insurer's liability on a subsequent loss like this would not be affected.

Although the master's use of the freight money collected was lawful, so that no specific fund any longer existed to which any lien could attach, and though no legal liability of the master resulted from using the money, still, if the owners were personally bound to pay for the expenses, or the repairs, to which the $1,900 were applied, the cases of *The Virgin*, 8 Pet. 538, 553, and *The Cynthia*, 16 Jur. 749, contain *dicta* to the effect that the bottomry holder would have "a resulting right to compensation over against the owners," on the equitable ground that they had in legal effect made use of the bottomry holder's fund to discharge an obligation which they were personally bound to pay. Great difficulties seem to me to be involved in this view, having reference to the legal rank of liens, the inherent conditions and implications of bottomry, and the fact that by our own law, in the absence of some wrongful or illegal act, the only remedy on the bottomry contract is *in rem*. Admiralty rule 18; *Duncan* v. *Benson*, 1 Exch. 537, 556, 3 Exch. 644, 656. The Codes of France, (section 331,) and of Italy, (section 599,) are plainly incompatible with any such remedy over; for the remedy of the bottomry lender is expressly "reduced to the value of the effects saved, subject to the expenses of salvage, and to the claims of other privileged creditors having a preference." But if the *dicta* above referred to express any sound rule, it has no application to this case; for the reason that by the law of Germany the master's engagements and contracts entered into under his ordinary maritime powers constitute no personal obligation upon the owner. The correspondence put in evidence states this fact; and the provisions of section 452 of the German Code are very explicit to this effect. The question concerns the ultimate responsibility of the owner for the master's acts and engagements, arising out of sea

damage as one of the incidents of the voyage, in the prosecution of foreign commerce. According to the case of *Lloyd* v. *Guibert*, L. R. 1. Q. B. 115, 129, (*contra*, *Naylor* v. *Baltzell*, Taney, 55, 62,) it is, therefore, to be determined by the law of the ship's home; not from any inherent force of the law of the flag, but because, in the absence of other indications, and considering all the exigencies, and the conveniences of commerce, it will be presumed to have been the intent of the parties, under such circumstances, to contract with reference to that law. *The Gaetano*, 7. Prob. Div. 137, 148; *Bank* v. *Netherlands*, 10 Q. B. Div. 521, 529, 540; *The Brantford City*, 29 Fed. Rep. 373, 384–390. Article 452 of the German Code provides as follows:

"The owner is not personally responsible for the claims of third persons; but only the ship and freight are liable: (1) If the claim is based upon a contract which the master has made by virtue of his legal authority, and not in virtue of a specical power of attorney; * * * or (2) upon the non-performance, or incomplete performance, by the captain of his duties; . * * * unless the owner has expressly guarantied the performance of the contract."

Article 453, however, provides for the personal responsibility of the owner for seamen's wages. Although this exemption from a general personal liability is contrary to the English law, (*Cary* v. *White*, 5 Brown Parl. Cas. 325; *Arthur* v. *Barton*, 6 Mees. & W. 138; *Benson* v. *Duncan*, 1. Exch. 537, 554, 3 Exch. 644,) it is in accord with the American law, as laid down in the case of *The Virgin*, 8 Pet. 538, limiting the liability of the owners to the value of the vessel and freight that comes to their hands, and as expressly adjudged by TANEY, C. J., in the case of *Naylor* v. *Baltzell*, Taney, 55, 64, 66. Recent legislation has confirmed this limitation. 23 U. S. St. at Large, p. 57, c. 121, § 18. The German owners were, therefore, not personally bound to make, or to pay for, the necessary repairs or expenses to complete the voyage, except out of the property embarked in the adventure; and such, through the right of abandonment, is the general continental law. French Code de Com. §§ 298, 216. On this ground the case of *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, was decided, as respects a French ship. But the freights earned on the voyage were primarily liable for those uses; and their liability to that use outranked the libelants' prior lien, not only by the German Code, (articles 680, 757, 762, 773,) but by the general marine law. By that Code, also, (articles 774, 775) the owner is personally liable only for such freight. "as is actually received by him, or knowingly paid over to. lienors of inferior rank." In applying the freight moneys already collected to the purposes of completing the voyage, the master applied them. to claims superior to the libelants' lien; and he thereby not only performed his own maritime duty, but fulfilled all the personal obligations. of the owners in that behalf. By a recent act of congress (act June 26, 1884, 23 St. at Large, p. 57, c. 121, § 18) it is provided "that the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel. bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessel

and freight pending, * * * excepting wages due to persons employed by said ship-owners." See, also, act June 19, 1886 (24 St. at Large p. 80, c. 421, § 4.) This, in connection with the former act of 1851, (Rev. St. § 4283,) apparently brings the law of this country into harmony with the general continental law in respect to the limitation of the liability of ship-owners arising from the navigation of their vessels, and from the acts of masters, whether growing out of contract or of tort; and the earlier decisions in the English and American law touching the extent of the owner's liability for the master's acts or contracts, and the collateral obligations which depend upon that liability (see *Benson* v. *Duncan*, 1 Exch. 531, 3 Exch. 644; *Pope* v. *Nickerson*, 3 Story, 465) will become no longer applicable. The French law on this point, by the amendments to the Code in 1841, was settled in accordance with the views of Émérigon and Boulay-Paty, and with the decision of TANEY, C. J., in *Naylor* v. *Baltzell*, *supra;* to the contrary of what is stated by STORY, J., in *Pope* v. *Nickerson*, 3 Story, 499, (2 Desjardines, Droit Com. Mar. §§ 279, 280.)

No defense being, therefore, established, the libelant is entitled to a decree for $1,900, with interest and costs.