**ROCK TRANSPORT PROPERTIES CORPORATION, New York Trap Rock Corporation and Mellon National Bank and Trust Company, Plaintiffs,**

v.

**The HARTFORD FIRE INSURANCE COMPANY, Defendant.**

**No. 67 Civ. 1169.**

United States District Court, S. D. New York.

March 24, 1970.

Memorandum Opinion April 13, 1970.

See also D.C., 45 F.R.D. 373.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for plaintiffs; Edward C. Kalaidjian and Dwight B. Demeritt, Jr., New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; Daniel A. Sullivan and Alexander Peltz, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

This is an action to recover on two insurance policies for the "constructive total loss" of eleven scows and the partial loss of one scow, owned by plaintiff Rock Transport Properties Corporation and chartered by another plaintiff, New York Trap Rock Corporation. The remaining plaintiff, Mellon National Bank And Trust Company, was the mortgagee of all twelve scows.

Defendant, The Hartford Fire Insurance Company, issued two insurance policies covering these scows. The first insured for damages caused by accident or by negligence, provided such damage had not resulted from the owner's or manager's want of due diligence. The second was an increased value policy insuring each of the scows for an additional $3,-600 in excess of the $45,000 limit per scow of the first policy in the event of actual or constructive total loss from a peril covered by the first policy.

Plaintiffs claim that eleven of the scows were constructive total losses and seek to recover the entire value of both policies which amounts to $534,600, or $48,600 per scow. Plaintiffs claim that one scow, the EDGAR J. COY, sustained two "partial losses" and seek to recover $9,278 under the first policy.

The case was tried to a jury on November 13, 14, 17, 18, 19, 20 and 21, 1969.

There was sufficient evidence from which the jury could find the following facts:

The two policies involved here covered a period from April 1, 1965 to April 1, 1966. The scows were in sound condition at the beginning of this period,[1] and the damage occurred between April and December 1965 during the ice-free season on the Hudson River.[2] During this time, the scows were used to transport rip-rap, which includes crusher run, shovel run and capstone varying from dust to stones ten to twelve tons in weight. The large stones were loaded on the decks on top of a bed of crushed stone and carried from New York Trap Rock Corporation's Clinton Point quarry on the Hudson River, near Wappingers Falls, N. Y., to Port Jefferson on the north shore of Long Island. From there the stones were taken off the decks of the scows by the use of cranes, placed in trucks and transported to the south shore of Long Island where they were used in the construction of piers and breakwaters.

The most severe damage took place during the unloading operations at Port Jefferson. One witness often observed large irregular stones, weighing eight to fourteen tons, falling to the decks. Sometimes the stones were dropped or bumped around on the decks because the crane operator would lose control of them while turning the crane to get a better grip.[3] At other times, the crane's heavy bucket was not lowered slowly but allowed to crash down on the load of stones. On still other occasions, the crane operator maneuvered the scow by pushing and pulling with the crane's bucket, rather than by using tying lines.[4] This and other battering caused severe damage to the decks, bulkheads and underdeck structures of the steel scows.

There was no dispute that the insured value of each scow under both policies was $48,600,[5] and the joint survey indicated that the cost of repairing the eleven scows claimed to be constructive total losses exceeded their insured value.[6] The repair bills for the "partially lost" scow COY indicated that the amount of repairs was $9,278.[7]

At the conclusion of trial, counsel for both sides stipulated to submit only part of the case to the jury on special verdicts, leaving the determination of the remaining issues of law and questions of fact to the court.[8]

Pursuant to this stipulation, therefore, the case was submitted to the jury on special verdicts under Rule 49(a), Fed. R.Civ.P., prepared by the court with the consent of both sides, requiring answers to four questions:

## "SPECIAL VERDICTS

1. Did the damage result from a peril covered by the insurance policies?

 Answer (write 'Yes' or 'No'):_____

 If your answer to Question No. 1 above is 'No,' drop your deliberations; if your answer is 'Yes,' then answer the following questions:

2. Does the cost of necessary repairs to restore the scows to sound condition exceed their insured value?

 Answer (write 'Yes' or 'No'):_____

3. If your answer to Question No. 2 above is 'Yes,' what is the total amount of the salvage of the eleven scows?

 Answer (write dollar amount):_____

4. As to the scow 'COY,' what were plaintiff's damages?

1. Plaintiffs' Exhibit 118; Trial Transcript (Tr.) 23–28, 32–41, 43–44.

2. Tr. 24, 43.

3. Tr. 259–261, 268–273, 290–291.

4. Tr. 256–259, 275–277, 452–454.

5. Plaintiffs' Exhibits 1A and 2.

6. Plaintiffs' Exhibits 58, 58A, 97 and 97A; Tr. 443–452, 455–464, 475.

7. Plaintiffs' Exhibits 80 and 81A; Tr. 61–64, 67–68.

8. Tr. 747–756.

Answer (write dollar amount) :———"

The jury answered "yes" to the first question. Plaintiffs contended throughout that the damage was caused by an insured peril, either by accident or by negligence, and insisted that they exercised due diligence in caring for the scows. Defendant argued, on the other hand, that the damage was caused by ordinary wear and tear, the natural and usual result of carrying rip-rap.

We instructed the jury without exception that in order to answer "yes" to the first question it had to find that the damage was caused by accident or by negligence that occurred during the period of time covered by these insurance policies provided plaintiffs used due diligence, that is, furnished a scow and equipment capable of carrying this kind of material.[9] We explained that in order to determine whether the damage was caused by accident, the jury must decide whether it was "unexpected, unintentional, sudden and therefore accidental, or if the damage was intentional, expected and gradual and, therefore, not accidental within the meaning of the insurance policies." We charged the jury that negligence is simply "a failure to use a reasonable degree of care under all the circumstances" and that it could not find negligence if the damage were caused by ordinary wear and tear since that would constitute reasonable care under the circumstances.[10]

In answering "yes" to the first question, the jury necessarily determined that the damage to these scows occurred during the insured period and was caused by accident or negligence, not by ordinary wear and tear, and, therefore, a peril insured against by the policies.

The jury answered "yes" to the second question finding that the cost of necessary repairs to restore the scows exceeded their insured value, and in answer to the third question found that the

total salvage value of the scows amounted to $247,500. Finally, in answer to the fourth question, the jury found that with regard to the "partially lost" scow COY, plaintiffs' damages were $9,278.

■ There was sufficient evidence, as previously noted, to submit these questions to the jury, and the jury's verdict is amply supported by the record. The jury's finding in answer to the third question, that the salvage value of the scows amounted to $247,500, was an increase over plaintiffs' contention that the salvage value should be $92,400 or $101,-921.[11] The jury's increase is reasonable in light of the fact that there was evidence that the scows were used after these accidents, and this would necessarily tend to inflate salvage value.

■ Defendant moved under Rule 50 (a), Fed.R.Civ.P., at the conclusion of trial, for a directed verdict and the court reserved decision. After trial, defendant renewed its motion for a directed verdict on the ground that the jury's answers were against the weight of the evidence. That ground would support a motion for a new trial and not a motion for a directed verdict. To compound the confusion, defendant moved after trial under Rule 50(b), Fed.R.Civ.P., which provides for judgment notwithstanding the verdict. In any event, defendant has not established that it is entitled to relief under any of these provisions. The evidence outlined above was legally sufficient for the case to go to the jury. Defendant did not at the time, nor does it now, take any exception to the charge, and the jury's answers to the four stipulated questions were based on more than sufficient evidence.[12]

Defendant's motion for a directed verdict is, therefore, denied.

Two questions remain: (1) whether plaintiffs forfeited their right to recover on these policies by failing to give de-

9. Tr. 865–866.

10. Tr. 863–863a.

11. Plaintiffs' Exhibit 97A; Tr. 860–861, 872.

12. See 5 J. Moore, Federal Practice ¶ 50.-03 [2] (2d ed. 1969).

fendant timely notice of the accidents, and (2) whether plaintiffs forfeited their right to claim a constructive total loss by failing to abandon or at least tender abandonment of the scows.

The first question turns on the construction of a clause in the policy which provides that:

> "8) In the event of any accident involving the vessels insured hereunder, notice shall be given to these Underwriters as soon as possible so that their own surveyor may attend any survey held to determine the extent of the damage or loss and the cost of repairing the same." [13]

Defendant claims that plaintiffs did not notify it of the accidents "as soon as possible" and thereby breached a material condition of the insurance policies.

The damage to the scows did not, however, occur because of one accident, at one specific time. Rather it was a series of accidents occurring between April 1965 and December 1965.

Defendant claims that plaintiffs did not notify it of the damage until July 1, 1965, despite the fact that plaintiffs knew of the damage generally as early as April 17, 1965 and were fully aware of its extent by early June, when they notified the insurance broker of their claim. In short, defendant claims that although plaintiffs knew of the serious damage to the scows, either because of written damage reports or internal inspection, they delayed notifying defendant of this damage for at least three months concerning certain scows and as much as four months for others.

Defendant, relying on cases defining the contractual language of "as soon as possible" as notice "within a reasonable time under all the circumstances," [14] and others holding delays of 22, 28 and 56 days, where no explanation or excuse is offered, unreasonable,[15] argues that plaintiffs' three-month delay in giving notice breached a material condition of the contract.

Defendant would have us hold that plaintiffs forfeited their rights under these insurance policies by the mechanical application of standards of timeliness derived solely from prior cases decided under different circumstances without any consideration of the parties' purpose in including this notice provision.

■ . A contract is the creature of the parties' intent.[16] The parties' "manifested purpose" controls the interpretation of contract provisions and precedents are of little value.[17]

■ The contract, here, with rather unusual clarity, expressly states that plaintiffs are required to give defendant notice "as soon as possible" so that defendant "could have his [sic] own surveyor attend any survey held to determine the extent" of the damage. In light of this unequivocal manifestation of purpose, the notice provision must be construed to require plaintiffs to furnish defendant with notice sufficient to allow defendant to have its surveyor present at any surveys.

■ It is undisputed that plaintiffs sent defendant notice of the accidents

---

13. Plaintiffs' Exhibit 1A.

14. Vanderbilt v. Indemnity Ins. Co. of North America, 265 App.Div. 495, 39 N.Y.S.2d 808 (2d Dep't 1943); American Lumbermens Mut. Cas. Co. of Illinois v. Klein, 63 F.Supp. 701 (E.D.N.Y.1945).

15. Rushing v. Commercial Cas. Ins. Co., 251 N.Y. 302, 167 N.E. 450 (1929); Vanderbilt v. Indemnity Ins. Co. of North America, *supra*; American Lumbermens Mut. Cas. Co. of Illinois v. Klein, *supra*.

16. See, Restatement of Contracts § 226 (1932); 3 Corbin, Contracts § 538 p. 55, § 545 p. 164 (1960).

17. See, Restatement of Contracts §§ 226, 227 and 235(a) (1932).
"When it becomes clear that the parties intended to produce a certain factual result, interpretation should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result." 3 Corbin, Contracts § 545, p. 164 (1960).

prior to any survey of the scows,[18] that defendant was represented by a surveyor at the surveys conducted on each and every scow,[19] and that all of the scows were jointly surveyed before the policies expired.[20]

Plaintiffs have accorded defendant the full intended benefit of the notice provision. We find, therefore, that plaintiffs gave defendant notice of the damage to the scows as intended by the parties in the contract. Since the jury has already determined that the damage to the scows resulted from a peril covered by the insurance policies, defendant is liable, and the only question remaining is the extent of that liability.

Defendant claims, however, that this otherwise valid claim for constructive total loss is barred by plaintiffs' failure to abandon or at least tender abandonment of the scows.

Plaintiffs admit that they did not abandon or even tender abandonment of the scows and concede such abandonment is usually necessary to a claim for constructive total loss. They argue, however, that defendant's unconditional disclaimer of liability when first presented with the entire claim constituted a waiver of any right it might otherwise have to abandonment or tender of abandonment.

Constructive total loss is a concept unique to marine insurance and exists when the cost of necessary repairs exceeds the value of the damaged vessel.[21] Property, therefore, still exists, albeit in damaged condition, after a constructive total loss occurs, as opposed to when an actual total loss occurs. An insured claiming a constructive total loss must usually abandon or tender abandonment to the insurer of whatever remains of the insured property. This requirement prevents an insured from recovering the full value of the insurance contract based on total loss and in addition retaining the damaged property, thus offering as a premium for constructive, as opposed to actual, total loss, the salvage value of the damaged property.

Abandonment is not, however, an absolute prerequisite to a claim for constructive total loss.[22] It is not required if it would be a futile act or an idle ceremony, such as when the damaged property has already been sold or captured.[23] Where an insurer disclaims liability on an insurance contract, it repudiates its interest in the contract and in the insured property. Disclaimer is totally incompatible with acceptance of a tender of abandonment. By disclaiming liability, an insurer, in effect, refuses abandonment because to accept it would require affirming liability and paying the full value of the contract. Disclaimer, thus, renders tender of abandonment totally futile.[24]

Here, defendant's loss manager, Mr. Biancheri, when presented with plaintiffs' claims as to the first scow, disclaimed liability out of hand on the ground that damage was not caused by an insured peril.[25] In so doing, defendant repudiated any liability under the insurance contract and acted totally inconsistent with acceptance of abandonment. Defendant thereby waived abandonment or tender of abandonment, opting for a complete defense to plaintiffs' claim.

---

18. Plaintiffs' Exhibits 58A and 94.

19. Tr. 440–441, 664.

20. Tr. 670.

21. Under American marine insurance law, the insured may claim for a constructive total loss where the cost of repairs merely exceeds half the value of the vessel. Here, however, the contract specifically provides that the cost of repairs must exceed the insured value (Plaintiffs' Exhibit 1, lines 165–166), and this becomes the controlling definition of constructive total loss. See, Gilmore & Black § 2–14, pp. 77–78 (1957).

22. See, Force v. Providence Washington Ins. Co., 35 F. 767 (N.D.N.Y.1888); Roux v. Salvador, [1836] 132 Eng.Rep. 413; Rankin v. Potter, (1873), 6 L.R., H.L. 83, 125.

23. Roux v. Salvador, *supra*.

24. See, Force v. Providence Washington Ins. Co., *supra*, at 775.

25. Tr. 415–416.

Moreover, the special verdict granting defendant a credit of $247,500 for the salvage value of the scows is compatible with the ultimate purpose of abandonment to prevent a defendant from recovering the full value of the damaged property and nevertheless retaining the property which, although damaged, is still of some value.

We find that defendant, in disclaiming liability, waived the performance of the technical act of abandonment or notice of abandonment, and since the jury has already found that the cost of necessary repairs exceeds the value of the scows, we conclude that plaintiffs are entitled to recover the full insured value of both policies for the eleven scows, that is, $534,600, less the salvage value of the scows, $247,500.

Consolidating our findings and conclusions with the special verdicts of the jury, plaintiffs are entitled to a judgment in the amount of $296,378, plus interest, consisting of $287,100 for the eleven scows that were constructive total losses, and $9,278 for the partial loss of the scow COY.

The foregoing opinion constitutes the court's findings of fact and conclusions of law pursuant to the parties' stipulation and Rule 52(a), Fed.R.Civ.P.

So ordered.

## MEMORANDUM

This is a dispute as to plaintiffs' right to pre-verdict interest and as to the applicable rate for computing the pre-verdict, pre-judgment and pre-payment interest.

Plaintiffs claim interest should begin to run from March 29, 1966, the date upon which the last of the surveys was conducted and the amount of plaintiffs' total damages ascertained. Defendant, on the other hand, claims that damages were unliquidated on March 29, 1966 and were not ascertainable until November 21, 1969, the day the jury, in answer to special verdicts, determined the actual amount of plaintiffs' damages and the credit defendant was to receive for salvage value.

This is a diversity action and we must look to the law of New York to determine plaintiffs' right to pre-verdict interest. St. Clair v. Eastern Air Lines, Inc., 302 F.2d 477, 480 (2d Cir. 1962); Spanos v. Skouras Theatres Corp., 235 F.Supp. 1, 17 (S.D.N.Y.1964). Pre-verdict interest is granted as a matter of right in contract actions by § 5001 of the New York Civil Practice Law and Rules (CPLR), and it is to be "computed from the earliest ascertainable date the cause of action existed." The cases construing this section make it quite clear that this applies regardless of whether damages were fixed on that date. See, Collier v. Granger, 258 F. Supp. 717, 718–719 (S.D.N.Y.1966). See also, Funkhouser v. J. B. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243 (1933).

Plaintiffs here select the date upon which the last survey had been taken, March 29, 1966, as the earliest possible date the cause of action existed, and since defendant had already disclaimed liability as of January 1966, it is obvious that the cause of action did in fact exist on the day the last survey was completed.

Plaintiffs are, therefor, entitled to pre-verdict interest from March 29, 1966 to November 21, 1969, to pre-judgment interest from November 21, 1969 to the date judgment is entered, and to post-judgment interest from the date judgment is entered to the date it is paid.

The parties dispute also the applicable rate of interest. Plaintiffs contend that the rate varies from 6% per annum to 7½% per annum, while defendant contends that the rate is 6% per annum.

Section 5004 CPLR provides that "interest shall be at the legal rate." The actual numerical rate, therefore, must be determined by reference to another statute. At the time the CPLR was enacted, § 370 of the General Business Law set the legal rate at 6% per annum. That

section was repealed, however, in 1964 and replaced by § 5–501(1) of the General Obligations Law which continued the "legal rate" of interest at 6% per annum. In May 1968, § 5–501(1) of the General Obligations Law was amended to provide that the "legal rate" would be "the rate prescribed by the banking board * * * or if no rate has been so prescribed, six per centum per annum." General Obligations Law § 5–501 (McKinney's 1969 Supp.). The banking board exercised this newly granted discretion and set the legal rate at 7.25% per annum from July 1, 1968 to February 15, 1969 and at 7½% per annum from February 16, 1969.

Defendant argues that § 5–501 of the General Obligations Law only delegates to the banking board the power to set the legal rate for a "loan or forbearance" and not for judgments because the language of that section applies only to a "loan or forbearance." Defendant relies for support on an advisory opinion by the Attorney General of New York State, N.Y.L.J., Jan. 16, 1969, p. 1, cols. 1–2, and one decison of the New York Supreme Court, New York County. Kay Lewis Enterprises v. Lewis-Marshall, 59 Misc.2d 862, 300 N.Y.S.2d 705 (1969). Four other decisions of the New York Supreme Court * and the weight of scholarly authority, however, take a contrary position and conclude that the rate of interest for judgments is the legal rate established by the banking board pursuant to amended § 5–501 of the General Obligations Law.

The most comprehensive and persuasive opinion on this question, written by Mr. Justice Crisona in Jamaica Savings Bank v. Giacomantonio, 59 Misc.2d 704, 300 N.Y.S.2d 218 (Sup.Ct. Queens Co. 1969), points out that even though the recently amended language of § 5–501 of the General Obligations Law does not specifically state that it applies to interest on judgments, the language of that section did not specifically apply to interest on judgment before it was amended, and yet it was held by court decision and by want of any other applicable statute to set the legal rate of interest referred to in § 5004 of the CPLR.

Although there is certainly a legitimate question, here, as to what actually is the legal rate of interest for judgments in New York state, the weight of authority and the most persuasive construction of the New York statutes would indicate that the legal rate of interest applicable to judgments is the rate of interest set by the banking board.

Plaintiffs are, therefore, entitled to interest on their damages of $296,378.00 at 6% per annum from March 29, 1966 to June 30, 1968, at 7.25% from July 1, 1968 to February 15, 1969, and at 7.5% from February 16, 1969 until the date of payment.

Accordingly, the Clerk of the court is directed to enter judgment for plaintiffs and against defendant in the amount of $296,378.00 with interest at 6% per annum from March 29, 1966 to June 30, 1968, then at 7.25% from July 1, 1968 to February 15, 1969, and finally at 7.5% from February 16, 1969 to the date of payment.

So ordered.

---

* Gelco Builders & Burjay Constr. Corp. v. Simpson Factors Corp., 60 Misc.2d 492, 301 N.Y.S.2d 728 (Sup.Ct.N.Y.Co.1969); Jamaica Savings Bank v. Giacemantonio, 59 Misc.2d 704, 300 N.Y.S.2d 218 (Sup. Ct.Queens Co.1969); Welch v. Di Gaetano, N.Y.L.J., May 12, 1969, p. 19; Dime Savings Bank of Brooklyn v. Carlozzo, 58 Misc.2d 821 296 N.Y.S.2d 805 (Sup.Ct. Suffolk Co.1969).