Nick C. SPANOS, Plaintiff,

v.

**SKOURAS THEATRES CORPORATION,**
Theatre & Cinema, Inc., Philhamboro,
Inc., Youngstown Theatres Corporation
and Modern Playhouses, Inc., Defend-
ants.

United States District Court
S. D. New York.

Oct. 30, 1964.

1

Kissam & Halpin, New York City, for plaintiff, Leo T. Kissam, Michael W. Graney, Edmond K. Leach, New York City, of counsel.

Sherpick, Regan & Davis, New York City, for defendants, Eugene A. Sherpick, William C. Woodson, New York City, of counsel.

WYATT, District Judge.

This is an action by a lawyer to recover compensation for professional services.

There are two separate claims, each stated in a separate count: (1) for $126,000 said to be due under a specific contingent fee agreement (for 17½% of recovery) and (2) for $875,000 as the claimed reasonable value of his services.

There was a trial to the Court, a jury having been waived after demand by defendants for a jury trial.

### 1. Jurisdiction of this Court

Jurisdiction of this Court is laid on diversity of citizenship. 28 U.S.C. § 1332(a) (1).

Defendant corporations are stipulated each to have its principal place of business in New York; they are thus citizens of New York for diversity purposes. 28 U.S.C. § 1332(c).

Plaintiff alleges that he is a citizen of California. Defendants deny this, asserting that he is a citizen of New York and that this defeats diversity jurisdiction in this Court.

This jurisdictional issue must first be decided.

An individual citizen of the United States who is domiciled in a particular state is a citizen of that state. Citizenship of an individual, therefore, for diversity purposes, is in that state in which he or she is domiciled. Williams v. Osenton, 232 U.S. 619, 624, 34 S.Ct. 442, 58 L.Ed. 758 (1914).

Jurisdiction of this Court is determined by the state of affairs when the action is here commenced. Smith v. Sperling, 354 U.S. 91, 93, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (footnote 1) (1957); Dery v. Wyer, 265 F.2d 804, 808 (2d Cir. 1959). The question then is whether plaintiff was domiciled in New York on October 13, 1959 when this action was commenced. The answer depends on the facts of record relevant to domicile.

Plaintiff (usually for convenience "Spanos") was born in Greece in 1918. He was brought by his parents to this country as a child and became a citizen of the United States through the naturalization of his father. He grew up in Pittsburgh, living with his parents there, and graduated from the University of Pittsburgh. He graduated from Harvard Law School in June 1947. While in law school he became interested in the antitrust problems of the motion picture industry and wrote a thesis on the subject. He then worked for a year in New York for the Motion Picture Producers and Distributors Association. In July 1948, he went to California, apparently to settle down there. He got a position with a law firm in Los Angeles and, after taking the necessary examination, was admitted to the California bar on January 4, 1949. About that same time he left the law firm and began to work on claims under the antitrust laws of W. D. Fulton against producers and distributors of movies (apparently now accepted as a synonym for motion pictures; Webster's Third New International Dictionary, page 1480). Fulton had been a movie theatre operator in Kansas City, Missouri, and had retained W. G. Boatright,

a lawyer in Kansas City, to press his claims. At the urging of Fulton, plaintiff became associated in 1949 with Boatright in the Fulton case. The complaint containing Fulton's claim was filed, however, in the federal court in California. This was in June 1949. (The action was later transferred to Kansas City by court order.)

Spanos has had, since January 1949, an office address in California. This has generally been office space in an office of others but at times he may have had an office by himself. Until early 1955, Spanos lived at various addresses in the Los Angeles area—a rooming house, a club, apartments. His mother at one time had a home in Los Angeles and he lived there for a while. Between January 1949 and early 1955, he was away from California intermittently; since early 1955, he has been away from California continuously and has not had a physical residence—apartment, home, club room or the like—in California.

In June 1955, Spanos rented an apartment in New York and moved his residence here; he had theretofore lived in hotels when in New York. His purpose in coming to New York was in connection with the services for which he here sues. It seems fair to infer that his intention was to give up any residence in New York when these services were concluded.

Spanos married in April 1956 and brought his wife to live in his New York apartment, soon moving to a larger apartment nearby. Two children were born to Spanos and his wife in New York. He and his family gave up residence and their apartment in New York in July or August 1959, following his discharge by defendants on October 13, 1958. They then moved to Kansas City where they had already rented an apartment. They were living in that apartment or in a rented house in Kansas City when this action was commenced. From January 1949 to the commencement of this action, the principal interest of Spanos was in working on movie antitrust suits, some in California but

**4**

most of them outside California, principally in Kansas City and New York.

■ Considering all the facts of record, and particularly that Spanos since early in 1949 has been a member of the California bar and is not admitted to the bar of any other state, I conclude that he established a domicile in California in 1948. Defendants would seem to have the burden to show that this domicile, once established, was abandoned in favor of a New York domicile. State of Texas v. State of Florida, 306 U.S. 398, 427, 59 S.Ct. 563, 830, 83 L.Ed. 817 (1939); but cf. Haymes v. Columbia Pictures Corp., 16 F.R.D. 118, 120 (S.D.N.Y.1954). Regardless of the burden of proof, I do not feel that the record facts permit a finding that Spanos changed his domicile to New York. In this connection, it seems highly significant that he did not apply for admission to the New York bar. He was eligible for admission without examination (Rule VII of the Rules of the Court of Appeals of New York). It is inconceivable that Spanos, had he intended to make his home permanently in New York, would not have applied for admission to the New York bar. His failure to do so evidences an intent not to reside permanently in New York.

■ While he did not maintain a residence—home, room, apartment—in California, this is not essential to maintain a domicile, which frequently exists without any residence. See, for example, Sweeney v. District of Columbia, 72 App.D.C. 30, 113 F.2d 25, 26, 27, 29, 129 A.L.R. 1370 (1940), cert. denied 310 U.S. 631, 60 S.Ct. 1082, 84 L.Ed. 1402 (1940).

At the commencement of this action, plaintiff was domiciled in California, possibly in Missouri. In any case, he was not domiciled in, and thus not a citizen of, New York at the commencement of this action. Accordingly, there is jurisdiction in this Court by reason of diversity of citizenship.

2. The Express Agreement Claim

This action, like many others, may be said to derive from United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). This decision was that the major producers and distributors of movies had violated the antitrust laws, among other things, in that they had discriminated against independent exhibitors in favor of theatres owned by them. "Clearances have been used along with price fixing to suppress competition with the theatres of the exhibitor-defendants and with other favored exhibitors" (334 U.S. at 148, 68 S.Ct. at 924).

Three brothers of Greek birth or descent—George, Spyros and Charles Skouras—were active and successful in the motion picture industry in the United States for many years before and after the events in suit.

Defendant Skouras Theatres Corporation ("Skouras Theatres") operates a chain of movie houses in and around New York City. The other four defendant corporations own individual movie theatres and are themselves wholly or partially owned subsidiaries of Skouras Theatres. The five defendant corporations are sometimes referred to herein as the "Skouras companies".

One-half of the stock of Skouras Theatres is owned by Metropolitan Playhouses, Inc. ("Metropolitan"); the other half of the stock of Skouras Theatres is owned by members of the Skouras family.

The controlling stock interest in Metropolitan is owned by United Artists Theatre Circuit, Inc. ("United").

George P. Skouras (sometimes "George" or "George Skouras") was at all relevant times President of Metropolitan and of United. During the relevant period George was a director but not an officer of Skouras Theatres. It is stipulated between the parties that if George acted for Skouras Theatres or for any other defendant in making any agreements with Spanos (and defendants deny that he made any agreements for them with Spanos), the agreements would be binding on defendants. Aside from the stipulation, the record establishes that George was the dominant

figure in the affairs of defendant corporations and clearly had authority to act for them.

For many years the Skouras companies have received the professional services of the following able and outstanding New York lawyers: (1) the law firm of Weisman, Celler, Allan, Spett & Sheinberg, headed by Milton C. Weisman, Esq., and with 13 partners and 23 associates; (2) the law firm of Sherpick, Regan & Davis, a smaller firm headed by Eugene A. Sherpick, Esq.; (3) James M. Landis, Esq., a former Dean of Harvard Law School and holder of many responsible positions in the national government; and (4) Louis M. Weber, Esq., whose full time was employed as house counsel. Weisman and Landis were at all relevant times directors of Skouras Theatres.

The Paramount decision in 1948 stimulated many private treble damage actions under the antitrust laws (15 U.S.C. § 15). They were generally by independent exhibitors against the big producers-distributors-exhibitors who had been defendants in the Paramount and related cases.

Relying on the Paramount decision and beginning at least as early as 1951, the Weisman firm, the Sherpick firm, and Landis had worked on a contemplated treble damage action by the five Skouras companies who are defendants in the case at bar. The lawyers understood that their professional work in this connection was on a contingent compensation basis but there was no agreement with the clients as to the percentage. A complaint was drafted and distributed among the prospective defendants. There were conferences with prospective defendants about the possibility of a settlement before the commencement of any action. In 1952 such a settlement was in fact made with Loew's. As a part of this settlement, Loew's paid a lump sum as counsel fees for the Skouras companies, which sum was divided between the Weisman firm, the Sherpick firm, and Landis by amicable understanding between them. The division is evidence of the relative responsibility and amount of work done as between the lawyers: it was 3/5 to the Weisman firm, 1/5 to the Sherpick firm and 1/5 to Landis.

It then (in late 1952) seemed probable that an action would have to be commenced against all the prospective defendants except Loew's.

Not long before this juncture Spanos had been brought strikingly to the attention of George and Landis. The United States Court of Appeals for the Eighth Circuit in February 1952 affirmed a judgment after jury trial for $1,125,-000 (as trebled) in favor of an independent movie exhibitor. Twentieth Century-Fox Film Corp. et al. v. Brookside Theatre Corp., 194 F.2d 846. This was the case (earlier mentioned) in which Fulton had interested Spanos, which Spanos had filed in California, which had been transferred to Kansas City, and as to which Spanos had formed an association with Boatright. The Brookside plaintiff relied heavily on the decree in Paramount as prima facie evidence. The parallel with the contemplated Skouras case was obvious. The trade press gave publicity to the Brookside judgment and to the connection of Spanos with it. This came to the attention of George and Landis, both of whom had known Spanos before his Brookside success. They had very much in mind the prospective action for the Skouras companies, and concluded that the successful experience of Spanos in the Brookside case would make him very valuable as a member of their team.

George suggested that Landis get in touch with Spanos and work it out to secure his services for the Skouras case. Landis did so and beginning about November 1952 Spanos, at the invitation of Landis, made a number of trips to New York and talked with George and Landis.

These talks led to an agreement of association between Landis and Spanos and a separate agreement of guarantee between Spanos and the Skouras companies. The form of the arrangement must have been influenced by the fact that Spanos, as Landis and George well

knew, was not a member of the New York bar.

The agreement between Landis and Spanos is reflected in a letter from Spanos to Landis, dated June 29, 1953. Spanos was to "become associated" with Landis "in the representation of Skouras Theatres Corporation and/or United Artists Theatre Circuit, Inc., or either, or both of them, as to certain litigation and other matters"; in other words, the association was not general but was specifically for the Skouras business. Spanos was free to continue his "present law practice" involving antitrust actions, nearly all of which were away from New York; he agreed that by January 4, 1954 he would move his "principal place of business" and "residence" to New York. As to compensation the letter states: "It was also agreed that I would receive as my minimum compensation from you $15,000.00 a year, beginning June 8th, 1953, plus a certain unspecified percentage of the total fee which you receive on any matters as to which I perform services." There was reference to a guarantee by George, as President of United, of "the $15,000.00 minimum". The letter also recites—oddly enough, in view of what was actually done—that Landis was to provide "suitable office space and stenographic service".

The guarantee agreement between between Spanos and the Skouras companies is reflected in a letter from George to Spanos dated June 5, 1953 and signed also by Spanos under the word "approved". This letter recites the association with Landis and refers to the agreement with Landis for compensation as follows: "Your compensation for such services as you rendered in that connection was to be a certain yearly minimum guarantee to be applied against or in addition to a certain percentage of the total fee Mr. Landis received from such litigation as you participated in in association with him." The letter further refers to compensation as follows: "* * * you and Mr. Landis had reached a definite agreement that the minimum yearly guarantee which you were to receive was to be $15,000. a year. However, the percentage arrangement that you were to have with Mr. Landis was not worked out as yet nor was the compensation which you were to receive for the four trips you made to New York, but it was expressly agreed and understood that at some future date the exact percentage between you and Mr. Landis would be set, as would the amount you were to be paid for your time and services on those four trips to New York in March and April of 1953." There is then a guarantee by "our companies" of "the minimum amount of $15,000" and a promise to pay travelling expenses and hotel bills of Spanos in New York until January 4, 1954 when Spanos agreed to move to New York. It was agreed that Spanos "would be permitted to continue with such litigation" as he had already filed; on the other hand, Spanos promised to undertake no further litigation which would interfere with his acting in the Skouras suit.

The June 5, 1953 letter of George to Spanos was on the letterhead of United and was signed by George above the word "President". The guarantee, however, was by "our companies" which in the context certainly includes the defendants in the case at bar and may include Metropolitan and United as well.

The complaint of the Skouras companies was filed in this Court on June 3, 1953 and is still pending. The attorneys of record were and are the Weisman firm. Names of counsel appear on the cover of the printed complaint: two from the Weisman firm, two from the Sherpick firm, Landis, and Weber. Spanos did not sign or appear as counsel. There were numerous defendants. The title of the action was Skouras Theatres Corporation et al. v. Radio-Keith-Orpheum Theatres, Inc., et al., D.C., 193 F.Supp. 401. The action is usually referred to as "the industry suit".

It is agreed by both sides that Spanos performed professional services in connection with the industry suit from some time between December 1952 and June

1953 through October 1958. It appears from the record that these services began by at least the first week in March 1953.

The agreements with Spanos for the $15,000 annual minimum took effect beginning June 8, 1953.

For his services before June 8, 1953 Spanos was paid by Landis and payments against the $15,000 annual minimum were first made by Landis. In each case, Landis was reimbursed by Skouras Theatres.

Beginning with September 9, 1953, all payments on the $15,000 annual minimum were made by checks of Skouras Theatres payable directly to Spanos and generally with an accompanying voucher on which were the words "payment on account of legal fees".

Travel expenses were likewise paid directly to Spanos by Skouras Theatres against statements rendered by Spanos.

It was stipulated between the parties that the total amount received by Spanos by way of the $15,000 annual minimum and other sums—either directly from Skouras Theatres or from Landis—was approximately $83,000.

As already noted, the written understanding was that Landis would supply Spanos with "office space and stenographic service" in New York. It does not appear, however, that Spanos ever asked Landis for this or expected to receive it. He worked from the beginning at a desk in the offices of Skouras Theatres at 233 West 49th Street.

While Spanos saw Landis occasionally, either at meetings of counsel or otherwise, and while for a time there was an occasional exchange of letters, he worked directly with the Skouras companies and independently of Landis. Certainly he was not under any supervision by Landis and their association was in name only. Spanos put it in a letter in July 1953 that his hiring was to be "full and equal" with Weisman, Sherpick and Landis. In any event the association between Spanos and Landis was nominal.

In fact, Landis himself did very little on the industry suit after the complaint was filed. As he testified, his participation was "minimal, if not negligible", apparently because he could not afford to invest time in any substantial degree under a contingent fee arrangement. By the early part of 1955 Landis had ceased all activity of any significance in connection with the industry suit.

The Sherpick firm withdrew from the industry suit at about the same time as Landis and for the same reason (the firm continued in the industry suit as attorneys for George Skouras personally; George had been brought in as defendant to a counterclaim).

Meanwhile Spanos—while from time to time performing services—had not complied with his undertaking to move to New York by January 4, 1954. He was busy in Los Angeles, Kansas City and elsewhere on his other cases; he came to New York when required for the Skouras case and stayed at a hotel. Finally in June of 1955 he rented an apartment in New York and moved his residence here. No one seems to have complained at the time of his delay in moving to New York.

The position of leadership among counsel for plaintiffs in the industry suit was always held to a degree by Weisman and his firm. After the filing of the complaint this position became progressively stronger and eventually became exclusive. The case at bar appears to have been caused in large part by the inability of Spanos and the Weisman firm to work together in harmony. Spanos declared as early as July 1953 that Weisman had a "patronizing attitude" toward his suggestions, that his firm treated the suit as "their suit", that if certain views of Weisman had been followed the suit "would have exploded", and that the Weisman firm was trying to "hog" the work. Characteristically these statements were made in a letter to Weber, not to Landis; Spanos testified that he showed the letter to Landis in Los Angeles (where Landis happened to be on another matter) before sending it. When Weisman was shown a copy in New York by Weber, he wrote George that the let-

ter was "childish" and "unwarranted" and raised a "serious problem" because of the "disruptive and contentious attitude" which it showed. It is of no moment here where the right and wrong were; it is of significance that the "problem" was never solved.

Under date of March 20, 1956 a written retainer agreement was made between the Weisman firm and the Skouras companies. The points to be noted in this agreement are: (1) the Weisman firm was to be the "sole and only attorneys"; (2) their fee was to be 22½% of any recovery; (3) disbursements were to be repaid to them (including up to $150 per week for any lawyer or lawyers "directly" engaged by them); and (4) they were to have "the aid and cooperation of Mr. Nick Spanos" but it was provided that the clients "shall make separate arrangements for his compensation". At the suggestion of Weisman, formal letters of withdrawal were sent about this time by Landis and Sherpick.

At no time before the Landis withdrawal had there been any agreement between him and Spanos as to the percentage of the Landis contingent fee which Spanos should receive in addition to the $15,000 annual minimum.

At the same time there had never been any agreement between Landis and the Skouras companies as to his percentage as a contingent fee. Presumably Landis was at some time paid for his services in the industry suit (in addition to his ⅕ share in the fee on the Loew's settlement) but, although Spanos after his discharge asked Landis how much "if anything" he had been paid, the record does not disclose any reply nor does the information otherwise appear of record.

The formal retirement of Landis in 1956 of course made obsolete the 1953 arrangement on paper between him and Spanos. It was no longer possible for Spanos to receive a "certain percentage" of the contingent fee received by Landis because Landis would never receive any contingent fee. It would seem natural for some new arrangement then to be reached with Spanos, taking into account the withdrawal of Landis. The initiative for the new arrangement would in normal course have been expected to come from George, who not only had been dealing directly with Spanos but who knew of the agreement with Weisman that "separate arrangements" should be made by the Skouras companies for the compensation of Spanos. If at that time the services of Spanos for any reason were no longer desired, he could have been discharged then; apparently this was not the desire of the Skouras companies. In this connection it may be remembered that the Skouras companies had a commitment to supply Weisman with the "aid and cooperation" of Spanos.

In fact, no one seems to have informed Spanos of the change in arrangements with counsel and no one proposed a new arrangement with him. Landis ignored Spanos completely in the matter of his withdrawal, did not discuss the question of compensation to Spanos with George, and gave no information to Spanos. The attitude of Landis is expressed in his testimony (by deposition): "I didn't see that I was concerned in it". This attitude is not really so strange. Spanos had been brought in by Landis at the suggestion (amounting virtually to a direction) of George, the client; the "association" between Landis and Spanos was only on paper; and from the beginning Spanos had been dealing directly with George and the Skouras companies.

Although George did not come forward to inform Spanos of the changes and to make a new arrangement with him, Spanos learned in a short time of the March 20, 1956 agreement with the Weisman firm.

Spanos then in about May 1956 talked to George about that new retainer agreement. The claim for Spanos and his testimony is that George agreed in this talk that Spanos would be paid 17½% of any recovery. This 17½% added to the 22½% agreed upon with the Weisman firm would make a total of 40% in contingent fees, a figure which Spanos says had been talked about between him

and George from the beginning. George denied making any 17½% agreement. He testified that he did have a discussion with Spanos about the Weisman contingent fee agreement. I find that George in this talk with Spanos within a short time after the March 20, 1956 agreement did renew the promise to Spanos of a contingent fee (which was natural since the Landis conduit had been removed). I find that George did not agree to the 17½% figure or to any percentage as a contingent fee. I make this finding against the Spanos claim and testimony largely because of the demand letter written by Spanos to Skouras Theatres under date of October 13, 1958 and at a time after he had learned of a settlement with one of the industry suit defendants. In this letter Spanos stated:

"Under my contract with you, I have a contingent interest in this settlement. I think the size of this contingent interest should be promptly fixed * * *".

If Spanos had had an agreement for a 17½% contingent interest, he would not have later been asking for the "size" of the interest to be "fixed". I believe that fixing the "size" meant fixing the percentage. If it be suggested that fixing the "size" meant fixing the dollar "size" (because the "dollar value" of the settlement may have been subject to dispute), it is still a virtual certainty that Spanos would have mentioned the 17½% figure in his October 13 letter if he had an agreement on that figure. His failure then or at any other time prior to suit to refer in any writing to the 17½%, tells heavily against his claim.

After the withdrawal of Landis and after the March 20, 1956 retainer agreement with the Weisman firm, Spanos continued to perform services in the industry suit. It must have been clear to George Skouras that Spanos believed he would receive a contingent fee from Skouras Theatres; George knew that Spanos had never expected to work for the $15,000 annual minimum and nothing more.

After many sessions in 1956 of the deposition of George Skouras, there was a long period when activity was at a greatly reduced level. Spanos performed services from time to time but his relations with the Skouras companies seemed to develop into a certain coldness.

At the beginning of 1958 there were evidently serious financial problems in Skouras Theatres. A retrenchment program was felt necessary and it was announced that no "executive salaries" would be paid. Spanos immediately in early January 1958 wrote a formal and legalistic letter to Skouras Theatres setting forth his "position on this matter", emphasizing the nature of his $15,000 guarantee. About the same time Spanos gave up his desk at the Skouras offices and secured an office, or office space, at 111 Broadway; neither at the new address nor at any other place or time did Spanos hold himself out as a lawyer in New York.

During the time he had a desk in the Skouras offices, Spanos rendered legal services in a number of matters for the Skouras companies or affiliates which were unconnected with the industry suit and for which he expected compensation. For example, he did legal work for Magna Theatre Corporation, an affiliate, for which he asked a fee of $2000 from Magna. He stated in this connection: "I was here [New York] practically full time from June, 1954 to December, 1955 and I would say my attention was occupied more with Magna matters than with anything else". In January 1958 Spanos set forth in a letter a number of matters which seem to have been important, which were not related to the industry suit, and as to which he had rendered legal services for which he apparently expected compensation. So far as appears, Spanos rendered legal services in these other matters in New York directly to the Skouras clients. Although Spanos testified that he always worked with other lawyers in New York, there is nothing in his letters at the time (or otherwise) which indicates that this was true as to the Magna and the other mat-

ters apart from the industry suit. It is unnecessary to consider whether as to these other matters there was any violation of law from the fact that Spanos was not admitted to the New York bar; he is not here asking any compensation for services in the other matters and any violation of law as to them would seem to be entirely separate and not a good defense in the case at bar.

After he moved his office to 111 Broadway, there seems to have been little consultation between Spanos and the Skouras companies.

In August 1958 the Weisman firm negotiated a settlement with two of the "RKO" defendants in the industry suit.

Spanos learned of this settlement from the newspapers and under date of September 22, 1958 wrote Skouras Theatres. He referred to the fact that he had not been consulted about the settlement or even informed of it; he stated that he had been at all times "available" and that the situation therefore "cannot of course affect in any way the contract which exists between us".

Some time went by without any answer to this September 22, 1958 letter. Spanos learned more details of the settlement and wrote another letter dated October 13, 1958 to which reference has been made once before. The October 13 letter recites that the dollar value of the settlement with the RKO defendants "appears to be well in excess of $600,000.00"; there follows the demand for fixing the "size" of his contingent fee.

By letter dated October 13, 1958, George—for Skouras Theatres—discharged Spanos.

The letter of discharge was actually prepared and sent as a reaction to receipt of the demand by Spanos to fix the size of his contingent fee. The discharge letter was prepared by George, with the help of Landis, after receipt on October 14 of the demand letter of Spanos dated October 13. The discharge letter was mailed on October 14—as established by the postmark—but was dated October 13 in order to mask the fact that it was written *after* the receipt of the Spanos October 13 letter.

The postmark "October 14" is itself strong evidence for the conclusion reached. If, as George testified, the discharge letter had been written on October 13 when his office was closed because of the Columbus Day holiday and when only Landis, he and his secretary were in the office, then it would seem only natural to have mailed the letter that same day. If it was so important and so urgent to prepare the discharge letter on October 13 that three people met at the closed office on a holiday to do so, then it would seem equally important and urgent to mail it that same day. There was a postage meter in the Skouras office. True, the letter was registered and a trip to the post office may have been necessary but Columbus Day is not a national holiday (36 U.S.C. § 146; 5 U.S.C. § 86a) and the post offices were open on October 13, 1958.

Even stronger evidence is seen from a study of draft replies to the September 22, 1958 letter of Spanos. George testified that it was the receipt of the September 22 letter from Spanos which brought about the decision to discharge him. Draft replies to the September 22 letter were put in evidence. The earlier draft replies do *not* discharge Spanos; they merely chide Spanos for "sending such threatening letters". It is not until the letter dated October 13, 1958 is prepared that language of discharge is employed. This naturally suggests that after the early drafts had been prepared without any discharge language something occurred which prompted the discharge. This could only have been the receipt of the letter dated October 13, 1958 from Spanos demanding a "contingent interest" in the RKO settlement.

Whether the discharge letter was written on October 13 or on October 14 does not, of course, determine the rights of the parties. The incident does show, however, a questionable attitude toward Spanos on the part of George Skouras and Landis, who had themselves brought Spanos into the situation in the first

place and who knew that Spanos had agreed to render his services on the understanding that he would get some percentage of any recovery.

This action was instituted by Spanos following his discharge.

■ There can be no recovery on the claim for a 17½% contingent interest because of the finding that there never was any such agreement.

### 3. The Defense of Illegality

There can be recovery on the second count, that in quantum meruit, unless recovery is defeated by the fact that plaintiff is not a member of the New York bar. Defendants vigorously assert the defense of illegality based on a claimed violation by Spanos of Sections 270 and 271 of the Penal Law of New York McKinney's Consol.Laws, c. 40; these sections are concerned with the practice of law in New York without a license. The answer contains a counterclaim to recover—on the ground of alleged illegality—all moneys paid to Spanos.

Preliminarily it may be observed that this is not a case where a person not trained in law—such as an accountant —attempts to render legal services. Against such efforts, the public should be protected. The plaintiff here is well trained in law and is a member in good standing of the California bar. The industry suit was in this federal court, not in a state court, and all that plaintiff did in the industry suit was on a cause of action created by a federal law which was being asserted in a federal court. There was never any misrepresentation by plaintiff or any holding himself out as a lawyer to the New York public. Defendants here knew from the beginning that he was not admitted in New York; needing (as they thought) his particular experience it meant nothing to defendants whether he was or was not admitted to the New York bar. Defendants were amply supplied with able and experienced members of the New York bar. Defendants relied primarily on their New York lawyers rather than on plaintiff. Whatever may have been his hope or belief at the outset, plaintiff acted primarily as a consultant to the New York lawyers. He did, of course, work directly with George Skouras and others in the Skouras companies but this did not so much involve abstract legal advice as it did a study of the facts, an analysis of correspondence and other records, and the rendering of assistance to George in preparing on the facts for his deposition. Spanos was not an attorney of record and never acted for defendants in court or during any pretrial procedures (except as a spectator). He drew no pleadings or other court papers. He helped members of the New York bar in connection with pleadings and other papers in the industry suit but *did nothing on his own responsibility.*

Apparently the defendants concede that Spanos could recover on quantum meruit had he been admitted to the bar of this Court pro hac vice for the purpose of acting specifically in the industry suit. It cannot seriously be doubted that at any time on motion, the admission of Spanos pro hac vice would have been authorized by this Court. General Rule 3(c) of this Court authorizes such a motion, and the normal practice of the Court is to grant the motion when made. Defendants correctly point out that granting such a motion is a matter of discretion and cite an instance from the Fourth Circuit where the motion was denied. Thomas v. Cassidy, 249 F.2d 91 (4th Cir. 1957). The reason for the denial was "unlawyerlike conduct in connection with the case in which he wished to appear" (249 F.2d at 92). There is no suggestion in the case at bar that any conduct of Spanos would have justified the same treatment.

■ Under the circumstances here present, a failure to make the procedural motion for admission pro hac vice ought not to be decisive to deny plaintiff a recovery to which he would otherwise be entitled. Particularly is this true where plaintiff, a California lawyer, had come here to help in the industry suit at the request of a New York lawyer and where he was at all times working on the same matter as a professional colleague with

many other New York lawyers. These resident New York lawyers knew the facts and would seem to have had some obligation to call the relevant sections of the New York Penal Law to his attention and to move the admission of Spanos pro hac vice if this were necessary to avoid a violation of law or unprofessional conduct on his part.

We turn now to the sections of the Penal Law on which defendants rely.

Section 271 of the Penal Law is not applicable here because it deals only with the doing of certain specific acts and Spanos did none of the acts specified.

Section 270 of the Penal Law from its wording seems also to deal specifically and only with (a) practice in the courts and (b) the "holding out" or misrepresentation to the public of a lawyer status. This was the view of the statute of the late Mr. Justice Shientag. In re Bercu, 188 Misc. 406, 69 N.Y.S.2d 730, 739 (Sp. Term, N.Y.Cty.1947), reversed 273 App. Div. 524, 78 N.Y.S.2d 209 (1st Dept. 1948; Glennon, J., dissenting), affirmed 299 N.Y. 728, 87 N.E.2d 451 (1949).

Reading the words literally, Spanos does not seem to have done any of the specific acts forbidden by Section 270.

The New York courts, however, have given an expanded meaning to Section 270.

It was held some time ago—when the language of Section 270 was not quite the same as now—that "[t]o practice * * law *in any manner* is prohibited to those not lawyers" by the section. People v. Alfani, 227 N.Y. 334, 337, 125 N.E. 671, 672 (1919; emphasis in original). Alfani was a 4–2 decision, the dissenting judges taking the position that the statute prohibited only the appearing in court and the holding out of lawyer status. Chief Judge Hiscock appears to have agreed with this view but concurred in the decision because he felt that in the case before him there was evidence of holding out.

Whatever argument may be made from the words of the statute has been foreclosed, however, not only by Bercu,

above, but by a more recent case in the New York Court of Appeals, In re Roel, 3 N.Y.2d 224, 165 N.Y.S.2d 31, 144 N.E. 2d 24 (1957). Roel definitely establishes that Section 270 prohibits generally "the practice of law" (3 N.Y.2d at 228, 165 N.Y.S.2d 31, 144 N.E.2d 24) in New York without a New York license.

The question under New York law then is simply whether what Spanos did here was "the practice of law".

The best and most recent indication of the attitude in New York to this question is Spivak v. Sachs, 21 A.D.2d 348, 250 N.Y.S.2d 666 (1st Dept. 1964). Spivak, a California lawyer, came to New York to help Mrs. Sachs in matrimonial litigation pending in Connecticut and contemplated in New York. He rendered the services from day to day for some two weeks. A majority of the Appellate Division held that Spivak could recover the reasonable value of his services. The Court emphasized the purpose of Section 270 (250 N.Y.S.2d at 668):

"The statutory purpose is the protection of the public against representation by persons who are exempt from the regulatory provisions which govern those admitted to practice."

The Court referred to the factual background (250 N.Y.S.2d at 667):

"Plaintiff correctly advised defendant that he would not be able to appear in any action and that the services he could perform would be limited to advice and consultation with the attorneys appearing for her. With complete understanding of the situation and under circumstances that clearly showed that it was contemplated that the services would be paid for, plaintiff came to New York and performed the services that were requested."

The Court declared (250 N.Y.S.2d at 668):

"But where, as here, a solitary incident is presented, and no otherwise improper act or holding out is involved, the statute is not violated."

It would seem that the "solitary incident" means a specific matter for one client, as opposed to "a continuing course of conduct" to which the Court had earlier referred. In context, it appears that the "continuing course of conduct" refers to representing a number of different clients in different matters and thus approximating the normal activities of an admitted lawyer practicing in New York.

While the question is a close one, I conclude that Spanos did not violate Section 270 and thus would not be barred from recovery in quantum meruit under New York law applicable in the ordinary case.

But this is not an ordinary case and even if the conduct of Spanos were violative of the terms of Section 270, I do not believe that New York could penalize Spanos by denying him recovery for the services rendered.

All such services were rendered in connection with an action first in contemplation and then commenced in this federal Court for alleged transgressions against federal law.

Congress has given to this Court specific authority to determine by rules how counsel may be admitted "to manage and conduct causes therein". 28 U.S.C. § 1654. This Court has adopted rules thereunder, including General Rule 3(c) as to admission pro hac vice.

Had plaintiff Spanos been admitted to the bar of this Court, pro hac vice in connection with the industry suit or otherwise, his right to recover for his services would not be defeated because he had practiced law in New York in contravention of New York law. New York could not by local statute or local policy obstruct the conduct of business in the federal courts. If lawyers, admitted to the bar of this Court, could not be paid for services rendered in actions pending in this Court because of a New York law or policy, then New York could effectively close down the national tribunals of justice. The basic constitutional relationship between the national government and the states forbids such a result. If any authority be needed, it may be found in Sperry v. State of Florida ex rel. Florida Bar, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), holding that a state may not prevent a non-lawyer registered to practice before the United States Patent Office but not a member of the state bar from performing services incident to his employment in patent matters even though his services amount to "the practice of law" (373 U.S. at 383, 83 S.Ct. 1322). The Supreme Court declared (373 U.S. at 384, 83 S.Ct. at 1325):

"But 'the law of the State, though enacted in the exercise of powers not contraverted, must yield' when incompatible with federal legislation. Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23. Congress has provided that the Commissioner of Patents 'may prescribe regulations governing the *recognition* and conduct *of agents,* attorneys, *or other persons* representing applicants or other parties before the Patent Office,' 35 U.S.C. § 31, and the Commissioner, pursuant to § 31, has provided by regulation that '[a]n applicant for patent * * * *may be represented by an* attorney or *agent* authorized to practice before the Patent Office in patent cases.' 37 CFR § 1.31. (Emphasis added.)"

In this connection, the provisions of 28 U.S.C. § 1654, already noted, seem in parallel. The Supreme Court in the same opinion elsewhere stated (373 U.S. at 385, 83 S.Ct. at 1326):

"A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress. 'No State law can hinder or obstruct the free use

of a license granted under an act of Congress.' Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. 518, 566, 14 L.Ed. 249."

Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957) is also interesting. The decision was that disbarment by a state court does not automatically disbar in the federal court. The state disbarment "is not conclusively binding on the federal courts" (354 U.S. at 282, 77 S.Ct. at 1276). The Supreme Court said (354 U.S. at 281, 77 S.Ct. at 1276):

> "While a lawyer is admitted into a federal court by way of a state court, he is not automatically sent out of the federal court by the same route. The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included."

It would, of course, be a most unusual case but under the Theard decision a lawyer disbarred in New York might still continue to be a member of the bar of this Court. If so, such a lawyer could surely recover the reasonable value of services rendered in a matter pending in this Court. It would seem that New York could not constitutionally deny him recovery in the courts of the state, and his right to relief in this Court would seem clear.

Defendants correctly point out that in fact Spanos was not admitted to the bar of this Court pro hac vice. As indicated earlier, I do not feel that this ought to be decisive to deny him recovery of that to which he would otherwise be entitled. As was said in Cochran v. Burdick, 63 App.D.C. 150, 70 F.2d 754, 756 (1934):

> "Plaintiff was a lawyer in good standing in other courts, and was entitled to rely upon the general practice of courts of record, both state and federal, to permit members of the bar in other jurisdictions to appear as counsel on trial and argument in special causes."

The conclusion is that Spanos may recover for the reasonable value of his services.

### 4. The Reasonable Value of the Services

The last question, and in many ways the most difficult is: What is the reasonable value of the services of Spanos?

There was not a great deal of activity in court or in pre-trial proceedings between the filing of the complaint in the industry suit (June 3, 1953) and the discharge of Spanos (October 13, 1958).

A motion to dismiss the complaint was granted in July 1953 (with leave to amend).

In September 1953 an amended complaint was filed and in October more defendants were added.

In November 1953 there was a motion by the industry suit defendants to require plaintiffs separately to state and number; in December 1953 these defendants moved to consolidate the industry suit with another similar action; in January 1954 there was a motion for a separate trial of certain issues.

In August 1954 the motion to consolidate was granted; the other motions were denied.

Between May 14 and August 30, 1956, there were 33 sessions of the deposition of George Skouras, taken by the industry suit defendants. The deposition was not completed, was adjourned and never resumed.

In October 1956 the industry suit defendants moved to require George to answer certain questions which at his deposition he had refused to answer (on advice of Mr. Weisman).

In June 1957 the Skouras companies filed interrogatories.

In January 1958 the motion to compel answers by George Skouras was decided.

In June 1958 motions by some or all of the industry suit defendants to amend their answers were granted on default.

In August 1958 settlement was reached with two RKO defendants.

Under date of October 13, 1958, Spanos was discharged.

It is very difficult to determine the contribution made by Spanos to this activity, such as it was. To some extent, this is because objections by defendants in this action (on the ground of attorney-client privilege) prevented any evidence as to what advice Spanos may have given. Evidence in this respect was limited under the principle that the attorney-client privilege "is not released by non-payment of the lawyer's fees, except insofar as the lawyer's testimony may be clearly necessary to establish his right thereto" (Drinker, Legal Ethics, page 135).

It would appear that the principal contribution of Spanos was in the investigation of files, the study of the facts based on such investigation, and assistance in the preparation on the facts of George Skouras in advance of and during the sessions of his deposition. The testimony of Spanos was that he was retained "to prepare the case for trial", "to marshal the evidence"; elsewhere he testified that his "principal function" was "to do the digging and go through the files". Most of this work was done during the last six months of 1953. At that time, according to Spanos, he insisted on an adjournment of the deposition until adequate preparation could take place. He says that he then went through many files, that he prepared a written summary of the facts of some 114 pages (which was marked for identification but not in evidence because of an earlier objection for defendants here, on the ground of attorney-client privilege), and that he worked intensively with George Skouras "at his home in the evenings" and at his home on weekends.

He had nothing to do with drafting the complaint but he says in this connection that he prepared a memorandum on the statute of limitations. On four trips to New York in March and April, 1953, he attended conferences, including some with counsel for prospective industry suit defendants, having to do with possible settlements.

Spanos attended conferences with the other Skouras lawyers about an amended complaint; he testified that he made suggestions which, by decision of George Skouras, were adopted.

He attended conferences about the motion to consolidate in January 1954 and says he participated in the preparation of memoranda and was in court at the argument. The responsibility for the memoranda and for oral argument was that of others.

From at least the spring of 1954 to the end of April 1956 the industry suit, according to the testimony of Spanos, was in a "dormant state". He was in effect on call during this period because the commencement of the deposition of George was uncertain; as he put it, he had finished what he was supposed to do and was "just sitting around".

Beginning at the end of April 1956, there was renewed activity in preparation for the deposition of George. In this, Spanos was active and attended 28 of the 33 sessions of the deposition, which adjourned on August 27, 1956.

After the deposition of George had adjourned on August 27, 1956, there is very little in the record as to anything Spanos did in the industry suit.

According to Spanos, he continued in this period to go over records with Ruskay (a lawyer retained by the Weisman firm), work which he said he had begun at the end of April 1956. The identification of this work with 1957 was in response to a question: "In 1957, what did you do?" The period was fixed no more precisely and the suggestion that it was "two and three times a week" in 1957 cannot be taken seriously. Except for the work with Ruskay, there was nothing to which Spanos testified that he did in 1957 and 1958. As he put it, the case was "substantially dormant" in 1957 and 1958 and he "did very little work on the case" in these years. He did not work on the motion to compel George Skouras to answer questions, nor on the RKO settlement. Kaufman (a partner of Weisman) testified that Spanos worked on "the interrogatory

phases" (the interrogatories were filed June 17, 1957) but what work he did in this respect or to what effect does not appear.

As to the work with Ruskay in going over records, not only is the period of time obscure but so also is the nature of the work. Spanos testified only that he would meet Ruskay "and go over these records" and he identified the records as "extensive manager's weekly reports, and things of that sort that had not been previously available". The testimony of Ruskay indicates that his work (that is, the work of Ruskay) on records was an independent project, a solo performance: "I was the one who examined the files", "I had the job". Ruskay further testified that "during a good part of [his] examination of these files Mr. Spanos participated from time to time during that examination". Ruskay explained, however, that Spanos did not go through the files but "occasionally * * * actually examined files", that Spanos "discussed" the records, and that he "offered his own suggestions". This went on "during the period that he was in town".

There may be a suggestion in the Ruskay testimony that Spanos was among those, who, according to Ruskay, prepared "the motion for production under Rule 34 which was an extensive job, took many months"; in fact, no such motion was made.

The strong impression from the record is that Spanos—for causes not necessarily to be attributed to him—made a limited contribution in the industry suit. In part, this is because there seems to have been little room for him in the case. The Weisman firm was large and competent; it had no great need for Spanos and if lengthy study of the files was required, the Weisman firm could and did hire a special lawyer (Ruskay) for the purpose. Spanos was available and had special talent and experience but was not used to the extent that he was available.

According to Spanos, he kept no record of time spent on the industry case or on any other case. His explanation, which seems perfectly reasonable, was that all of his matters were on a contingent basis. In preparation for his testimony in this action Spanos made an estimate of the hours he spent on the industry case as follows:

| 1953 | 1334 |
| 1954 | 622 |
| 1955 | 487 |
| 1956 | 975 |
| 1957 | 520 |
| 1958 | 220 |
| | 4158 |

A study of the record gives the feeling that this estimate, while accepted as sincere, exceeds the actual hours spent by as much as $33\frac{1}{3}\%$ if not more. For example, the hours estimated above for 1957 and 1958 total 740; yet Spanos testified that in those years he "did very little work on the case". The hours estimated above for 1954 and 1955 total 1109; yet Spanos wrote that during that period he was "occupied more with Magna matters than with anything else".

As to the amount in suit, it was, of course, very large; the damages demanded in the amended complaint, as trebled, were $87,690,000. Spanos was permitted, despite doubts by the Court, to testify to the "settlement value" of the industry suit but any such "value" is so speculative as to be for practical purposes, worthless. "Speculation cannot supply the place of proof". Moore v. Chesapeake & O. Ry. Co., 340 U.S. 573, 578, 71 S.Ct. 428, 430, 95 L.Ed. 547 (1951). It would seem impossible to submit "proof" of any "settlement value" of an action.

There have been benefits to the Skouras companies from the industry suit, some realized before and some realized after the discharge of Spanos. (In this connection, the early settlement with Loew's is disregarded.) The playing position of movies in the Skouras Theatres has been greatly improved. The settlement with the two RKO defendants in August and September, 1958 obtained for the Skouras companies (a) 56,488⅘ shares of Class A stock of

Metropolitan and (b) discontinuance of an action in the state court against them and a number of individuals, including George Skouras. The shares of Metropolitan had a value of at least $8 per share, the price at which shares had been bought by United in March 1958. The discontinuance of the action was a substantial benefit to the Skouras companies. There have been settlements (after the discharge of Spanos) with other defendants in the industry suit— RKO Teleradio Pictures, Inc., Stanley Warner, and Universal—under which substantial benefits were received by the Skouras companies.

In determining the value of the services of Spanos, it should be considered that it was the Skouras companies which asked him to render the services and to relocate his headquarters. It also appears that after Spanos accepted employment in the industry suit and because of that fact, Boatright required a change in their agreement so as to reduce from 50% to 25% the participation of Spanos in any contingent fees collected by them jointly; according to the figures submitted, this turned out to represent a reduction of $262,229.35 in what Spanos received from his participation with Boatright. On the other hand, work on the industry suit did not prevent Spanos from continuing his work on other matters, to which he devoted a great deal of time and from which he received fees in the relevant period of $347,825.75.

The factors which it is proper to consider in determining a fee are set out in Canon 12 of the Canons of Professional Ethics of the American Bar Association. They are ably discussed in an opinion by Judge Woolsey. In re Osofsky, 50 F.2d 925, 927 (S.D.N.Y. 1931). The principal considerations, in summary, are: (1) time (2) standing of the lawyer at the bar (3) amount involved (4) benefit to the client and (5) skill demanded.

Taking these factors into account and the others mentioned herein, I conclude that the reasonable value of the services of plaintiff in the industry suit is $150,000. Against this should be credited the total amount already paid to plaintiff on account of professional services. The parties stipulated that "payments of $15,000 per annum and other sums received by Plaintiff * * * totaled approximately $83,000" (Pre-Trial Order, page 11). The trial memorandum for plaintiff (page 7) states: "Plaintiff received $76,250.00 as guaranteed minimum payments and $6,488.49 for expenses, totaling $82,738.49, between June 1953 and November 1958." For present purposes payments to plaintiff for expenses should be disregarded. The record indicates that plaintiff should have received on the guarantee $80,000 from June 8, 1953 to October 8, 1958. The record (SM 1279) indicates that in addition plaintiff received $4,250, apparently on account of his services before June 8, 1953. The total received seems therefore to be $84,250 which will be used here and if in error may be corrected by motion to modify the judgment. On this basis the balance due on October 13, 1958 was $65,750.

In determining whether prejudgment interest is allowable on the balance due, resort must be had to the law of New York. St. Clair v. Eastern Airlines, Inc., 302 F.2d 477, 480 (2d Cir. 1962). New York CPLR § 5001 is controlling and gives a right to interest in a contract action (interpreted to mean express or implied) "from the earliest ascertainable date the cause of action existed". In the case of a discharged lawyer who recovers the reasonable value of his services, interest runs from the date of discharge. In re Montgomery's Estate, 246 App.Div. 495, 284 N.Y.S. 5 (4th Dept. 1936).

The foregoing contains the findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). The proposed findings and conclusions as submitted by the parties have been used and found helpful but they have not been specifically passed upon. If either side desires a specific ruling as to any of these, a mo-

18

tion will be entertained under Fed.R.Civ. P. 52(b).

The Clerk is directed to enter judgment in favor of plaintiff against defendants for $65,750 together with interest from October 13, 1958.

The Clerk is directed to enter judgment dismissing the counterclaim on the merits.

So ordered.